# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CLEVELAND VALENTINE,
AKA DEAN GRAY

Defendant.

REPORT AND
RECOMMENDATION
08-CR-6124

## Preliminary Statement

By Order of Judge David G. Larimer, dated June 16, 2008, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A). (Docket #11). Currently before the Court are motions by defendant Cleveland Valentine (hereinafter Valentine or defendant) to suppress certain evidence the government intends on using at trial. (Docket #20). A suppression hearing was held on February 26, 2009 and the hearing transcript was filed on April 13, 2009. Subsequent to the hearing, the parties were given until May 27, 2009 to file post-hearing briefs. The government filed a post-hearing brief (Docket #28) and the defendant did not. The following is my Report and Recommendation as to the defendant's motions.

## Findings of Fact

During the early morning hours on March 16, 2008, Officer

Myron Moses of the Rochester Police Department ("RPD") responded to a call of a stabbing at the Eclipse Nightclub on Thurston Road in the City of Rochester. See Transcript of Suppression Hearing held on February 26, 2009 (hereinafter "Tr. at ___") at pp. 5-6. As he was exiting his marked police car, Moses was notified by the police dispatcher that the suspect in the stabbing was a black female who was attempting to leave the nightclub. (Tr. at 6-7). Spotting a green Toyota with a black female passenger leaving the nightclub parking lot, Moses decided to get back in his car and follow the Toyota. (Tr. at 7). Moses saw the Toyota turn on to Thurston Road and heard a radio transmission from RPD Officer Wilfredo Carbonel who wanted the Toyota stopped. (Tr. at 7). Moses turned on the emergency lights of his police car and proceeded to stop the Toyota at the corner of Thurston Road and Chili Avenue. (Tr. at 7). An unmarked police vehicle driven by Officer Carbonel pulled up behind Moses's police car. (Tr. at 8). Carbonel exited his car in order to assist Moses with the stop of the Toyota. (Tr. at 8). At the time of the stop, Moses testified that he had no information that the defendant had done "anything wrong." (Tr. at 22).

Officer Carbonel was working in a plain clothes capacity on March 16, 2008. (Tr. at 25). Carbonel was in the vicinity of the Eclipse Nightclub as part of a law enforcement team that was looking for individuals "that were illegal [and] that may not have

proper documentation to be in this country." (Tr. at 25-26). One of the individuals who Carbonel was looking for was the defendant. (Tr. at 26). Carbonel had been told by United States Immigration & Customs Enforcement Agent Jose Garcia that Garcia was conducting a fraudulent document investigation involving the defendant. (Tr. at 26). Carbonel also believed that Valentine was involved in marijuana trafficking. (Tr. at 43-44). Carbonel knew that Valentine was possibly driving around in a green Toyota 4 Runner and had observed a green 4 Runner in the Eclipse parking lot that night. (Tr. at 26). At around 2:00 a.m., Carbonel observed the defendant and a black female exit the nightclub and get in the 4 Runner. (Tr. at 26). Moses immediately issued a request over the police radio for a uniformed police vehicle to stop the green Toyota 4 Runner. (Tr. at 27). As Officer Moses was stopping the vehicle, Carbonel was pulling up behind Moses in his unmarked car. (Tr. at 27). Officer Moses approached the Toyota on the driver's side and Carbonel on the passenger side of the car. (Tr. at 27). Moses asked the driver (later identified as the defendant) for his license, registration and insurance card. (Tr. at 9). The defendant produced a license in the name of Dean Gray and asked the female passenger (later identified as Jennifer White) to produce the registration and insurance card because the car belonged to her. (Tr. at 9). After the documents were produced, Valentine asked Moses why they were being stopped. (Tr. at 9). Officer

3

Moses told Valentine that they were investigating a stabbing that had occurred at the Eclipse Nightclub earlier that night. (Tr. at 9).

While Officer Moses spoke to the defendant, Officer Carbonel called Agent Garcia. (Tr. at 29). Holding the license, Moses returned to his police vehicle in order to run a record check on the defendant. (Tr. at 9-10). Officer Carbonel told Moses that he had been informed by United States Immigration & Customs Enforcement Agent Jose Garcia that Valentine was "possibly" an illegal alien. (Tr. at 10). Armed with the information about Valentine, Officer Moses returned to the Toyota. (Tr. at 28). Valentine was "taken out" of the vehicle, frisked for weapons and directed to "have a seat" in the back seat of the police car. (Tr. at 11, 18). Moses left the back door of the police vehicle open. (Tr. at 11). While waiting for the record check to be completed Officer Moses was informed that Ms. White was not the suspect wanted for questioning in the nightclub stabbing. (Tr. at 18).

Officer Carbonel then called Agent Garcia and, afer a brief telephone conversation, handed the phone to Officer Moses. (Tr. at 10, 32). According to Moses, Agent Garcia directed Moses to ask the defendant a "series of questions in regards to his 'illegalization' in the United States." (Tr. at 10). Officer Moses testified that once he had spoken to Agent Garcia and been informed of the identification investigation, Valentine was not

4

free to leave. (Tr. at 17). Officer Carbonel testified that at no point in his encounter with Valentine that evening was Valentine free to leave. (Tr. at 44).

Moses went back to the car and asked Valentine where he was born. (Tr. at 12). Valentine told Moses that he was born in the Virgin Islands and Moses asked if he was a United States citizen. (Tr. at 12). Valentine responded that he was. (Tr. at 12). Officer Moses then asked Valentine to tell him his social security number and Valentine could only provide five numbers. (Tr. at 12). When Moses was done with his conversation with Valentine, he handed the phone to Officer Carbonel who resumed his conversation with Agent Garcia. (Tr. at 12). Carbonel eventually handed the phone to Valentine so Agent Garcia could speak directly with the defendant. (Tr. at 30). Valentine remained in the back seat of the marked police car. (Tr. at 13). Agent Garcia testified that he immediately identified himself to Valentine and warned him that any false statements made during their telephone conversation could be a crime. (Tr. at 53). Garcia then asked Valentine what country he was a citizen of and Valentine responded that he was "born in the U.S. Virgin Islands." (Tr. at 54). After further questioning about his identity and social security number, Garcia warned him that falsely representing himself to be a citizen of the U.S. was a crime. (Tr. at 54). Agent Garcia then asked: "Are you sure you are a U.S. citizen?" and Valentine responded "Yes." (Tr. at 54).

5

Valentine then became "agitated and hung up the phone." (Tr. at 54). Carbonel told Moses that Valentine was going to be taken downtown. (Tr. at 13). Officer Moses then returned to the Toyota to let Ms. White know that Valentine would be taken downtown in the police vehicle. (Tr. at 13). Agent Garcia called Officer Carbonel and told him that he was going to go to his office to confirm the information provided by the defendant. (Tr. at 55). Carbonel told Garcia that they were going to transport the defendant to the downtown Public Safety Building ("PSB") for more questioning. (Tr. at 55).

After arrival at the PSB, Valentine was escorted to an interview room on the fourth floor. (Tr. at 16). From his federal office, Agent Garcia called Officer Carbonel. (Tr. at 56). After speaking with Garcia, Officer Carbonel again gave the phone to the defendant. (Tr. at 56). Garcia testified that he again asked Valentine if he was a U.S. citizen and Valentine again said yes. (Tr. at 56-57). Garcia then advised Valentine that he knew Valentine was not a U.S. citizen and was using a social security number that did not belong to him. (Tr. at 57). Garcia told Valentine that there was no benefit to lying to him and that when Valentine's "associates" tried to do the same thing, they ended up in jail. (Tr. at 57). Valentine then "terminated" the phone conversation. (Tr. at 57). Carbonel advised Valentine he was under arrest for possession of a false instrument, placed him in

6

handcuffs and took him to the PSB booking area. (Tr. at 38). During the booking process, Valentine identified his place of birth as Jamaica, then tried to change it to simply "the Islands." (Tr. at 39).

Agent Garcia testified that at the time Valentine was stopped by Officer Moses on March 16, 2008, his federal agency ("ICE")[1] had an active investigation into the defendant's activities, including drug distribution and money laundering, and "we were trying to wait for the right time to arrest him." (Tr. at 60-61). Garcia testified that it was his normal practice to give Miranda warnings to a suspected illegal alien who has lied to him, but has no recollection of following his normal practice when he questioned Valentine that evening. (Tr. at 62). Agent Garcia's notes he kept that evening do not indicate he gave Valentine any Miranda warnings. (Tr. at 58). Both Officer Carbonel and Officer Moses testified that they did not give Valentine Miranda warnings at any point on March 16, 2008. (Tr. at 17, 38).

## Discussion

The Stop of the Vehicle: The Court does not tarry long on whether the stop of the vehicle Valentine was operating during the early morning hours of March 16, 2008 was constitutional. The record supports any number of legitimate reasons for the stop of

---

[1] Immigration and Customs Enforcement Agency.

7

the vehicle including: (1) an observed traffic violation committed by the defendant by driving after dark without headlights; (2) a Terry stop to investigate the Toyota's quick departure from the Eclipse Nightclub after police learned that a black female was attempting to leave the nightclub after stabbing a patron, or (3) an arrest of Valentine based on a law enforcement investigation that revealed probable cause that Valentine had knowingly possessed and was using false identification documents. Suffice it so say that I find that law enforcement did not violate Valentine's Fourth Amendment rights when police pulled over the green Toyota 4 Runner he was driving during the early morning hours of March 16, 2008.

The Interrogation of the Defendant: The post-stop interrogation of the defendant, however, is more problematic for the government. This is so because the hearing testimony confirms that Miranda warnings were never given to Valentine at any point during his March 16th encounter with law enforcement. Law enforcement officers are required to give Miranda warnings before questioning a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The admissibility of Valentine's statements to Officer Moses, Officer Carbonel and Agent Garcia depends on whether Valentine's right to warnings required by

8

<u>Miranda</u> had attached.[2]

"Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." <u>United States v. Mitchell</u>, 966 F.2d 92, 98 (2d Cir. 1992). Thus, even in the absence of an actual arrest, an individual shall be deemed to be in custody when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." <u>United States v. Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995)(internal quotations and citations omitted), <i>cert. denied</i>, 516 U.S. 927 (1995); <u>see</u> <u>United States v. Hall</u>, 421 F.2d 540, 545 (2d Cir. 1969)("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."). The test for custody is an objective one based on the totality of circumstances surrounding the particular encounter at issue. <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." <u>Berkemer v. McCarty</u>, 468

_____

[2] The question of "custody" is the disputed issue here. The government does not contest that if the various interviews of Valentine were custodial, interrogation ocurred and incriminating information was obtained.

9

U.S. 420, 442 (1984). Indeed, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Id. at 440.

The foregoing recapitulation of the legal standard notwithstanding, "courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody" or otherwise deprived of his freedom of movement in any significant way. Id. at 441.

> Courts have looked at various factors in making this determination. These include: whether a suspect is or is not told that she is free to leave, see Campaneria v. Reid, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989); the location and atmosphere of the interrogation, see Oregon v. Mathiason, 429 U.S. 492, 494-95, 97 S.Ct. 711, 713-14(1977); the language and tone used by the police, see United States v. Guarno, 819 F.2d 28, 31-32 (2d Cir. 1987); whether the suspect is searched, frisked, or patted down, see United States v. Wilson, 901 F. Supp. 172, 175 (S.D.N.Y. 1995); and the length of the interrogation, see Berkemer, 468 U.S. at 437-38.

Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998). In United States v. Newton, the Second Circuit expanded on the proper test for determining whether an individual is "in custody" for purposes of complying with Miranda. 369 F.3d 659 (2d Cir. 2004). The court in Newton adopted a two part analysis: (1) the court must determine "whether a reasonable person would have thought he was free to

10

leave," (id. at 672); and, if not, (2) "whether his freedom of action has been curtailed to a degree associated with formal arrest" (id. at 671 (citations and internal quotation marks omitted)).

After careful review of totality of the circumstances surrounding the events of March 16, 2008, and after consideration of the various indicia of "custody," including, *inter alia*, the factors identified in Tankleff, I conclude that Valentine has satisfied both prongs of the Newton test.

A. Free to Leave: I find that an individual in Valentine's shoes could not have reasonably understood that he was free to leave the back seat of the marked police car when he was being questioned by various local and federal law enforcement officers. First, there is no dispute that Valentine was never told by Moses, Carbonel or Garcia that he was free to leave the vehicle in which he had been placed. "The most obvious and effective means of demonstrating" that a suspect has not been subjected to custodial interrogation "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). While it is true that Officer Moses and Officer Carbonel's "unarticulated plan"[3] that Valentine was not free to leave the police vehicle is not relevant to the custody analysis,

_____

[3] See Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

11

it is also true that their decision not to advise Valentine that he was free to exit the back seat of the police car is also relevant to determining custody for Miranda purposes.    See id. at 1350 ("[T]he absence of police advisement that the suspect is not under formal arrest, or that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting."); United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992)(the custody "inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave").

Second, the location and atmosphere of the interrogation, Tankleff, supra, was more consistent with custodial interrogation than "roadside questioning of a motorist detained pursuant to a routine traffic stop." Berkemer v. McCarty, 468 U.S. 420, 435 (1984). A reasonable person in Valentine's situation would quickly discern that his roadside detention was not going to be "temporary and brief" or that he would "most likely be allowed to continue on his way," as is typical of traffic stops. Id. at 437. Valentine was told the vehicle was being stopped because the officers were looking for a female suspect in a stabbing at the nightclub he had just left.    Valentine's female companion (and presumably the suspect in the stabbing) was allowed to remain in the car, while Valentine was directed by the officers to "step out of the vehicle

12

and walk to the rear of the police vehicle."[4]  (Tr. at 31-32).
While in the car, Valentine was not questioned about the stabbing
or any traffic infraction.  Rather, Officer Carbonel, who knew at
the time of the stop that Valentine was an illegal alien who was
involved with forged identification documents and was suspected of
drug trafficking, called Agent Garcia to let him know that he had
detained Valentine.    Agent Garcia, who was also aware of
Valentine's status in the United States, specifically directed
Carbonel and Moses to interrogate Valentine as to his citizenship.
The persistent questioning of Valentine (twice while confined in
the back of the police car and once at the PSB) on his citizenship,
a subject entirely different than the reason given to Valentine as
to why he was being stopped, supports the finding that the
atmosphere of Valentine's interrogation was more threatening than
that of a routine traffic stop or Terry stop.  See Berkemer v.
McCarty, 468 U.S. at 438 n.27 ("The brevity and spontaneity of an

---

[4]     In its post hearing brief, the government argues that
Valentine was "asked" to sit in the police car.  (See Docket #28 at
page 5).  At one point Officer Moses agreed with the prosecutor's
question that Valentine was "asked" to leave his car.  (Tr. at 11).
At another point, Moses stated that the defendant was "taken out of
the vehicle."  (Tr. at 18).  Officer Carbonel testified that "[w]e
had Mr. Gray [the defendant] step out of the vehicle" and "we had
him sit in the rear of the [police] vehicle."  (Tr. at 28-29).
Later, Carbonel testified: "We had him step out of the vehicle and
walk to the rear of the police vehicle."  (Tr. at 31-32).  Based on
the testimony elicited at the hearing, I specifically find that
Valentine's movement out of the vehicle and into the back seat of
the police vehicle was not voluntary but rather was directed,
controlled and required by Officers Moses and Carbonel.

13

ordinary traffic stop also reduces the danger that the driver through subterfuge will be made to incriminate himself.").

Third, the length of the detention was surely longer than the brief investigatory detention normally associated with either a routine traffic stop or a Terry stop. While the government did not elicit proof as to (1) the amount of time defendant spent sitting in his vehicle after the stop, (2) the amount of time the defendant spent in the back seat of the police car while he was questioned by Officer Moses, Officer Carbonel and Agent Garcia, or (3) the time the defendant spent being questioned in the interview room at the PSB, based on the sequence of events adduced during the hearing it certainly exceeded the length of time needed to conduct a routine traffic stop. A reasonable person removed from the vehicle he was driving, frisked for weapons, escorted by the police to the rear of a marked police vehicle where he was directed to sit, and thereafter subjected to repeated questioning (both in the back of the police car and later at the police station) would not "have thought he was free to leave the police encounter." United States v. Newton, 369 F.3d at 672.

B. Curtailment of Movement: The second prong of the Newton test is whether Valentine's "freedom of action" was curtailed to a degree associated with formal arrest. Relying on the Supreme Court's decision in Berkemer, the Second Circuit found "two factors as particularly relevant to determining whether a lawful

14

investigatory stop involves restraints generally associated with a formal arrest. The first is whether a reasonable person in the suspect's shoes would have understood that his detention was not likely to be temporary and brief. The second is whether a person stopped under the circumstances at issue would feel that he was completely at the mercy of the police." United States v. Newton, 369 F.2d at 675 (internal citation and quotations omitted).

Of course, many of the facts supporting the first prong of the Newton test support a finding that the second prong has also been met. A male suspect informed by police that he was stopped by the police to investigate a stabbing where the suspect was a black female, removed from his car and escorted to the back seat of the police car, frisked for weapons, placed in the back of the police car, subjected to repeated questioning about his citizenship while in the back of the police vehicle, transported to the police station and questioned again as to his citizenship would not reasonably conclude that his detention was likely to be "temporary and brief."

Similarly, a reasonable person would also conclude that the police were in complete control of his movements during the encounter and that he was being subjected to arrest like restraints. This was not a meeting in the familiar surroundings of the defendant's home or a situation where the defendant was free to walk around. Under police direction, Valentine was removed from

15

the vehicle he was driving and then frisked before being placed in the back seat of a marked police car. After being questioned repeatedly while seated in the back of the police car, and without his consent or approval, the defendant was driven by the police to the public safety building. Upon arrival at the PSB, the police escorted the defendant to an "interview room," where he was subjected to additional interrogation before finally being told he was under arrest. The complete control of Valentine's movements by law enforcement during the March 16th encounter is consistent with and comparable to the restrictions associated with formal arrest. In sum, Valentine's March 16, 2008 encounter with the police satisfies both prongs of the Newton test.

Pedigree Information: As an alternative argument, the government contends that Valentine's statements are not subject to suppression because "the information given consisted of pedigree information." The pedigree exception to Miranda is premised on the principle that pedigree information solicited through routine questioning of arrested persons during the booking process does not implicate the protections afforded by Miranda. "Routine questions about a suspect's identity and marital status, ordinarily innocent of any investigative purpose, do not pose the dangers Miranda was designed to check; they are rather the sort of questions normally attendant to arrest and custody." United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986) (emphasis supplied) (citation and internal

16

quotations omitted).

Relying on Judge Larimer's decision in United States v. Kadem, 317 F. Supp. 2d 239, 241-43 (W.D.N.Y. 2004), the government argues that the police officers and Agent Garcia were simply seeking "basic pedigree information" from Valentine. Kadem is distinguishable and indeed supports suppression of the statements at issue here. In Kadem, ICE agent Nelson Yera had arranged to interview an inmate housed at the Elmira Correctional Facility. The inmate's name (Abdelkrim Kadem) was listed on a Department of Corrections form ("Report of Alien Person Institutionalized") as an "institutionalized alien" who lived in Brooklyn, New York, but was born in Rome, Italy. The inmate was questioned in an interview room at the prison. Because Kadem was not placed in the interview room voluntarily, Judge Larimer found him to be in custody for Miranda purposes and, with one exception, suppressed the incriminating statements the inmate made to the ICE investigator at the prison.

The exception concerned Kadem's response to Agent Yera's initial question asking Kadem to state his name, date and place of birth. In finding this initial question different from the follow-up questions, Judge Larimer held: "There is no evidence that Yera knew the person that had been brought to the interview room and, therefore, it was entirely reasonable and proper for Yera to attempt to ascertain the name of the man before him and to make

17

sure he was the same person that had been identified in the Report of Person Institutionalized." United States v. Kadem, 317 F. Supp. at 241. Judge Larimer found that the purpose of Agent Yera's questions "was not to seek incriminating evidence for criminal prosecution but to simply ascertain the name and identity of the person who might well have issues concerning citizenship." Id. at 241-42.

Unlike Abdelkrim Kadem, at the time law enforcement placed Valentine in the back of the police vehicle and began questioning him, the officers knew exactly who he was, what his immigration status was and what other crimes he was suspected of committing. Officer Carbonel testified that at the time they were asking Valentine pedigree information, the officers already knew where Valentine was born and that he was a Jamaican citizen. (Tr. at 47). Indeed, Officer Moses testified he was specifically instructed by Agent Garcia to ask the defendant "a series of questions in regards to his illegalization" in the United States. (Tr. at 10). This was not a chance encounter leading to benign questions about pedigree. Agent Garcia testified that he and Officer Carbonel had spent months working on a joint investigation involving Valentine, they knew Valentine was involved in criminal activity, had targeted him for arrest and in fact were looking for him on March 16, 2008. "[W]e were trying to wait for the right time to arrest him," Carbonel testified. (Tr. at 60-61). Given

their prior knowledge of Valentine and his criminal activities, the government's argument that, like Agent Yera in Kadem, the officers here were simply asking routine pedigree questions in order to ascertain the identity of the person they were talking to, is not particularly persuasive. More credible is the notion that once Valentine was placed in the back of the police car, his interrogation was intended to elicit "an incriminating response" that could be used against him in a criminal proceeding. Rhode Island v. Innis, 446 U.S. 291, 301 (1980)("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.").

This was not a situation where "[t]he police meant only to gather ordinary information for administrative purposes." United States v. Carmona, 873 F.2d 569, 573 (2d Cir. 1989). Officer Carbonel testified that at the time he asked Valentine the pedigree questions, he already knew his alien status and use of false identification documents. (Tr. at 47). Because the officers' questions "were not necessary or attendant to the booking of defendant ..., and were intended to elicit incriminating information about the defendant's immigration status," the pedigree exception is not applicable. United States v. Piggott, No. 93-CR-199S, 1994 WL 228626, at *7 (W.D.N.Y. May 16, 1994)(citation and internal quotations omitted). In sum, I am not persuaded by the government's alternative argument that the protections afforded

19

by <u>Miranda</u> were not required because law enforcement was only seeking pedigree information from Valentine. <u>See</u> <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 603 n.14 (1990)("[R]ecognizing a 'booking exception' to <u>Miranda</u> does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's <u>Miranda</u> rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.")(citations and internal quotations omitted).

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motions to suppress be **granted.**

**SO ORDERED.**

JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated:  July 9, 2009
        Rochester, New York

20

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.
**SO ORDERED.**

Jonathan W. Feldman
United States Magistrate Judge

Dated: July $\underline{9}$, 2009
Rochester, New York

---

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(f) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).