UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

                                                                         DECISION AND ORDER

                                                                          08-CR-6124L

                       v.

CLEVELAND NATHANIEL VALENTINE,
a/k/a Jonas, a/k/a Dean Gray,

                        Defendant.
_____

       This Court referred all pretrial motions and other preliminary matters in this case to United States Magistrate Judge Jonathan W. Feldman pursuant to 28 U.S.C. § 636(b). Defendant, Cleveland Valentine, moved to suppress statements that he made to the police at around the time of his arrest on March 16, 2008 in Rochester, New York.

       Magistrate Judge Feldman held a suppression hearing and also gave counsel an opportunity to submit post-hearing briefs.[1] On July 9, 2009, Magistrate Judge Feldman issued a Report and Recommendation (Dkt. #30), familiarity with which is assumed, recommending that Valentine's motion to suppress be granted.

       The Government has filed objections (Dkt. #31) to the Report and Recommendation. I have reviewed both the Report and Recommendation and the Government's objections, as well as the

---

[1] The Government filed a post-hearing brief. Defendant did not.

transcript of the suppression hearings (Dkt. #26). I believe that the Magistrate Judge's Report and Recommendation is sound and correct and, accordingly, I adopt it.

**DISCUSSION**

**I. Standard of Review**

A district court reviews those portions of a report and recommendation to which a party has timely objected under a *de novo* standard of review. 28 U.S.C. § 636(b)(1)(C). After reviewing the Report and Recommendation and the objections thereto, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

If the magistrate judge made credibility findings with respect to witnesses' testimony at a suppression hearing, the district court has discretion to accept those findings based on the written record, but the court may not reject the magistrate judge's credibility findings without conducting an evidentiary hearing at which the district judge has the opportunity to observe the witnesses and evaluate their credibility firsthand. *See In re Karten*, 293 Fed.Appx. 734, 736 ("The Supreme Court has held that a district judge has broad discretion to accept a magistrate's credibility findings without hearing witness testimony, in the criminal suppression hearing context, consistent with due process") (citing *United States v. Raddatz*, 447 U.S. 667, 680-81 (1980)); *Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999) ("without an evidentiary hearing, the District Court could not reject the Magistrate Judge's proposed credibility finding").

The district court may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record. *See White v. Fischer*, No. 04-CV-5358, 2008 WL 4210478, at *1 (S.D.N.Y. Sept. 12, 2008). The clearly-erroneous standard also applies if a party makes only "conclusory or general objections, or simply reiterates his original arguments." *Barratt v. Joie*, No. 96-CV-324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002).

**II. The Magistrate Judge's Findings and Conclusions**

In the case at bar, Magistrate Judge Feldman based his recommendation that defendant's suppression motion be granted on several findings. First, he found that "Miranda warnings were never given to Valentine at any point during his March 16th encounter with law enforcement." Dkt. #30 at 8. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Government does not appear to object to or disagree with that finding.

Second, the magistrate judge concluded that Valentine was "in custody," for *Miranda* purposes, at the time that he made the statements in question, based on the factors set forth by the Second Circuit in *United States v. Newton*, 369 F.3d 659 (2d Cir.), *cert. denied*, 543 U.S. 947 (2004). Dkt. #30 at 11-16. The Government objects to that finding, particularly as to the statements made by defendant in the back of the police vehicle, prior to his being taken to the Public Safety Building for further questioning.

Magistrate Judge Feldman also found that Valentine's statements were not admissible under the "pedigree exception" to *Miranda*, under which the "solicitation of information concerning a

person's identity and background does not amount to custodial interrogation prohibited by *Miranda*[,] ... whether the solicitation occurs before ... or after ... *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (citations omitted). The Magistrate Judge found the pedigree exception inapplicable in this case, on the ground that the questions asked by the officers were not designed simply to gather routine, innocuous information, but to elicit an incriminating response. Dkt. #30 at 18-20. The Government objects to those findings and conclusions as well.

**III. Whether Defendant Was in Custody at the Time the Statements Were Made**

It is well settled that police may not interrogate a suspect who has been taken into custody without first advising him of his *Miranda* rights. *Newton*, 369 F.3d at 668. *Miranda*'s "in custody" requirement is met if questioning was "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987). Determining whether an individual is "in custody" requires the court to decide whether a reasonable person would have felt that he "was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Where there has been no formal arrest, then, the relevant judicial inquiry is whether the "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Ali*, 86 F.3d 275, 276 (2d Cir. 1996) (internal quotation and citation omitted). *See also Newton*, 369 F.3d at 671 ("The test for custody is an objective one:

'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest'") (quoting *Ali*, 68 F.3d at 1472).

In determining whether *Miranda* applies, the court must look at the totality of all the circumstances involved in the interrogation, including whether the suspect was advised of his right to leave, the location and atmosphere of the questioning, the language and tone used by the officers, whether the suspect was patted down, searched or frisked, and the length of the interrogation. *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998). *See also United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (stating that a person may be in custody even absent formal arrest, and that it is sufficient "when law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave").

Reviewing the record here, I concur with the magistrate judge's finding that Valentine was in custody at the time that he made the statements in question, including the statements that he made in the back seat of the police vehicle. While the Government emphasizes the facts that Valentine was not handcuffed and that the vehicle's back door was open, I am not persuaded by the Government's contention that a reasonable person in defendant's position would have felt free to terminate the interview in the back of the police car and leave.

The Government's contention that Valentine "willingly" went to Officer Moses's car to answer questions concerning his identity, Dkt. #31 at 19, begs the question. The mere fact that Valentine was not physically forced into the vehicle does not mean that he could reasonably have believed that he had much choice in the matter. Under the circumstances–defendant having been pulled over, informed that the police were investigating a stabbing that occurred in a bar from which Valentine had just come, told to get out of his car, frisked, and then directed to take a seat in the back

of the police car (which is hardly typical of a routine traffic stop)–the average person in defendant's shoes would not reasonably have believed that he could simply refuse and go on his way. Even if, as the Government now contends, the officer framed his statement about getting into the back of the police car in the form of an "invitation," it could hardly have sounded like an invitation that Valentine could easily have declined.

The fact that Valentine "terminated" his phone conversation with Agent Garcia also means little in this regard. Valentine's ability, at the push of a button, to end a telephone conversation with someone miles away has scant bearing on how he could reasonably have assessed his ability to leave the scene, when he was sitting in the back of a police car with two officers present. That point is reinforced by Valentine's subsequent ending of a second phone call with Garcia at the Public Safety Building, from which he was even more clearly not free to leave.

In that regard, the Government makes little effort to argue that Valentine was not in custody by the time he was taken to the Public Safety Building, and I believe that he clearly was. Valentine was taken to an interview room, where he was subjected to further questioning, and he was never given any indication that he could put an end to the questioning any time he wanted to and walk out. Considering all that had transpired up to that point, Valentine could not reasonably have believed that the officers would allow him to leave.

**IV. Pedigree Exception**

I further agree with Magistrate Judge Feldman that Valetine's statements do not fall within the pedigree exception to the *Miranda* rule. The pedigree exception generally covers "routine" questions designed to elicit "biographical data necessary to complete booking or pretrial services."

*Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). The pedigree exception does not include questions designed to elicit incriminating admissions. *Id.* at 602 n.14. As the Second Circuit has observed, "[r]outine questions about a suspect's identity ... [are] ordinarily innocent of any investigative purpose [and] do not pose the dangers *Miranda* was designed to check; they are rather the sort of questions 'normally attendant to arrest and custody.'" *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir.1986) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

In support of its argument that the exception applies here, the Government relies, as it did before the Magistrate Judge, on my decision in *United States v. Kadem*, 317 F.Supp.2d 239 (W.D.N.Y. 2004). In *Kadem*, in which the defendant was charged with making a false statement and similar offenses, this Court, adopting a Report and Recommendation of the magistrate judge to whom the case had been referred, granted the defendant's motion to suppress certain statements that he made to an Immigration and Customs Enforcement ("ICE") investigator, prior to any *Miranda* warnings being given.

In *Kadem*, I did also rule that "basic pedigree information" elicited by the investigator concerning the defendant's name and the date and place of his birth (which were falsely stated by the defendant, leading to the charges against him) could be instroduced in the Government's case in chief. *Id.* at 243. Significantly, however, the reason why the investigator wanted to speak to the defendant was not because the investigator suspected him of using a false name, being an undocumented alien, or otherwise having violated the immigration laws. Rather, the investigator initiated the interview because he had received a report of a suspected alien being held in state custody on criminal charges, which might have subjected the alien to deportation upon his release.

In my decision in *Kadem*, then, I noted that although the defendant was in custody at the time that he provided the pedigree information, "[t]here is no evidence that [Investigator] Yera knew the person that had been brought to the interview room and, therefore, it was entirely reasonable and proper for Yera to attempt to ascertain the name of the man before him and to make sure he was the same person that had been identified in the" report. *Id.* at 241. Based on that evidence, I expressly "f[ou]nd that Yera's purpose [in asking those pedigree questions] was not to seek incriminating evidence for criminal prosecution but to simply ascertain the name and identity of the person" with whom he was speaking. *Id. See also United States v. Rodriguez*, 356 F.3d 254, 259 (2d Cir. 2004) (no *Miranda* warning was required where agent's interview of defendant "was conducted solely for the purpose of determining whether Rodriguez would be subject to administrative detention after his release," and "[t]here [wa]s nothing in the record to indicate that Agent Smith knew or should have known that evidence for an eventual prosecution would emerge from his administrative interview of Rodriguez"); *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir.) (*Miranda* warnings were not required prior to questioning defendant about his birthplace and citizenship, since interview was being conducted "solely for the administrative purpose of determining whether Salgado was deportable when he got out of jail" on charges having "nothing to do with his immigration status"), *cert. denied*, 537 U.S. 1011 (2002).

In contrast, in the case at bar, one of the officers who was present at the time of the initial stop, Officer Wilfredo Carbonel, happened to be there because he had been parked nearby in a "plain clothes vehicle," as part of an investigation "looking for individuals ... that were illegal that may not have proper documentation to be in this country ... ." Tr. at 25-26. One of the persons that Carbonel was specifically looking for was "Dean Gray" (the alias that defendant was using), because Carbonel

"had information from [ICE] Agent [José] Garcia that Mr. Gray had some issues with a fraudulent documents investigation that [Garcia] was conducting." Tr. at 26.

Carbonel also had "information that [Gray] was possibly driving around in a green Toyota 4 Runner," *id.*, and on the night in question, a vehicle fitting that description was parked outside a bar near Carbonel's location. At around 2:00 a.m., Carbonel heard a radio call go out about a stabbing at the bar. A short time later, Carbonel saw "Dean Gray," with a female companion, exit the bar, get into the Toyota, and drive away. Tr. at 26-27.

Officer Moses, responding to the call about the stabbing, pulled defendant over. Carbonel followed and parked his car behind Moses's vehicle. Defendant identified himself to Moses as Dean Gray. Carbonel testified that "[w]e [*i.e.*, Carbonel and Officer Moses] had Mr. Gray step out of the vehicle," and "had him sit in the rear of [Moses's] vehicle ... ." Tr. at 28-29. While Moses spoke with "Mr. Gray," Carbonel called Agent Garcia on the telephone. Tr. at 29.

Garcia testified at the suppression hearing that he told Carbonel to have Officer Moses ask defendant "where he was born, what country he was a citizen of, and what was his Social Security number." Tr. at 53. At that point, Carbonel simply handed the phone to defendant, so that Garcia could speak to him directly. Tr. at 29, 53. It was during his conversation with Garcia that defendant made the first set of statements sought to be suppressed here, to the effect that he had been born in the United States Virgin Islands, that he was an American citizen, and so on.[2]

---

[2] Although he did not give defendant full *Miranda* warnings concerning his constitutional rights, Garcia testified that he did advise defendant "that any statements he made to [Garcia] that were not the truth construed [sic] a violation" of federal law. Tr. at 53. Though that warning did not satisfy *Miranda*, it is some indication that Garcia realized that Valentine might well respond falsely to Garcia's questions concerning his identity and national origin.

Clearly, then, the officers were not simply asking "routine" questions to ascertain the identity of the person to whom they were speaking, and to make sure that they had not apprehended the wrong individual. They had a strong suspicion that "Dean Gray" was an illegal alien in possession of fraudulent documents concerning his identity. Under those circumstances, their questions about defendant's name, birthplace, and similar information stand in sharp contrast to those of the investigator in *Kadem*, who had no particular reason to think that the person whom he was interviewing was using a false identity to avoid detection of his unlawful immigration status. *See also United States v. Toribio-Toribio*, No. 09-cr-161, 2009 WL 2426015, at *2 (N.D.N.Y. Aug. 6, 2009) (where officer "was reasonably aware of who he was interviewing[, and] had ample reason to believe that Defendant was falsely representing his citizenship, ... obtaining basic pedigree information ... was not just obtaining necessary background information, but was likely to provide the primary evidence supporting any violation" of the immigration laws, since in an immigration case, "questions pertaining to place of birth go beyond basic pedigree information and go to the heart of the crime itself"); *United States v. Piggott*, No. 93-CR-199, 1994 WL 228626, at *8 (W.D.N.Y. May 16, 1994) (since customs inspector suspected defendant of having presented an altered passport, and had verified his actual identity, inspector's "questioning of defendant about his identity was likely to elicit (and did elicit) incriminating information about defendant's immigration status, as well as defendant's alleged use of a falsified passport," and could not constitutionally be conducted absent prior *Miranda* warnings).

**V. Government's Request to Reopen the Suppression Hearing**

In its objections to the Report and Recommendation, the Government also states that "[t]o the extent that the record requires further clarification," the Government requests that the Court "reopen" the suppression hearing, to take further evidence concerning the length of time over which the relevant events occurred, exactly what was said to defendant that prompted him to take a seat in the back of Officer Moses's police car, and what the officers knew about defendant's immigration status at the time that he made the statements at issue. Dkt. #31 at 24-25.

The Government's request is denied. If the Government believed that these matters were not sufficiently clarified at the suppression hearing before Magistrate Judge Feldman, it had every opportunity and incentive to explore those matters further at that hearing. The Government's present request amounts to little more than an attempt at a second bite at the apple, in the hope that this time around the result will be more favorable to the Government. Moreover, I do not agree with the Government's assertion that any of these matters need further clarification. As the above discussion demonstrates, the relevant facts are clear. They simply do not support the Government's position. *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 196-97 (2d Cir. 2008) (outlining factors that district court should consider in deciding whether to grant motion to reopen suppression hearing).

**CONCLUSION**

I accept and adopt the Report and Recommendation (Dkt. #30) of United States Magistrate Judge Jonathan W. Feldman. Defendant's motion to suppress statements (Dkt. #20) is granted. The statements that defendant made to the police on March 16, 2008 in response to questioning about

his identity, birthdate, birthplace, and citizenship, prior to defendant's being given his *Miranda* warnings, are suppressed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
September 16, 2009